Paul C. TEAS, Jr., Appellant,

v.

Mildred KIMBALL, Appellee.

No. 17075.

United States Court of Appeals
Fifth Circuit.

Aug. 18, 1958.

Rehearing Denied Sept. 18, 1958.

John B. Luscombe, Jr., El Paso, Tex., Fryer, Milstead & Luscombe, El Paso, Tex., of counsel, for appellant.

J. F. Hulse, El Paso, Tex., Scott, Hulse, Marshall & Feuille, El Paso, Tex., of counsel, for appellee.

Before RIVES, JONES and WISDOM, Circuit Judges.

JONES, Circuit Judge.

Mildred Kimball, the appellee, formerly Mildred Ruddock, first met Paul C. Teas, Jr., the appellant, in 1954. Each was then engaged in ranching, raising purebred Santa Gertrudis cattle. In 1955, they met again, at a livestock association meeting in Texas, following which meeting the appellee bought some cattle from the appellant. She lived and had her ranch in Colorado, and his ranch and home were in Texas. Following another meeting between the two at a stock show in Ft. Worth, Texas, in February of 1956, they visited each other's ranches. The appellant told the appellee that he wanted to buy some land near his ranch for raising cotton commercially, and had hopes that his father would join with him in the venture. She expressed a desire to join appellant in the enterprise if the latter's father decided to stay out of it, and she gave appellant two $100,000 checks, one to be used for land purchase and the other as a loan for cotton farming operations. Mr. Teas, Sr. did not join his son. The appellant deposited both checks in a checking account which was in the joint names of his wife and himself. At the time the account contained about $34. In March of 1956, a purchase agreement was entered into, signed by the appellant and the appellee as purchasers and various persons named Franklin as sellers, for the sale of 898 acres of land, the consideration to be about $251,500.00. Options were also acquired under that agreement with respect to certain other tracts of land which it was believed might thereafter be useful in the cotton growing operation. On April 7, 1956, the 898 acres were conveyed by deed to appellant alone, appellee's name having been deleted from the deed with her consent. In payment the appellant became primarily obligated on some $180,000 worth of notes, the remainder of the purchase price being paid out of the cash obtained from the appellee's checks.

On May 10, 1956, the parties to this suit entered into a purported partnership agreement for the operation of a cotton farm on the land with each party having a half interest in the lands and sharing profits and losses equally. The appellee signed the agreement in Colorado. The appellant was to be the manager. The business, as recited in the agreement, was to be that of managing and operating a farming and ranching business on the property bought from the Franklins. Half of the mortgage obligations were assumed by the appellee. The partnership books were to be kept at the place

of business and be accessible to each partner. The appellee was then the wife of Merritt Kirk Ruddock. Meanwhile, the first cotton crop was planted, the appellant having made the necessary arrangements concerning labor, equipment, supplies, and supervision. During the summer, the appellee tried unsuccessfully to ascertain from the appellant the financial status of the business and the disposition which had been or was being made of the money which she had turned over to the appellant.

In September, 1956, appellee became divorced from her husband and resumed her maiden name of Kimball. Although the divorce took place in Nevada, it is conceded that at all times and for all purposes pertinent to this controversy, the appellee's domicil was in Colorado. Partly because of defective irrigation pumps, the 1956 cotton yield on the land was disappointing to the parties. Appellant, on October 9, 1956, conveyed the land to the appellee, the deed reciting that the grantee had been the actual contracting party in the original purchase, which had been accomplished with her money, and that appellant was the manager of the farm. By the deed, which was signed by both parties, the appellee agreed to assume the unpaid purchase money obligations to the Franklins. There was parol evidence tending to show that this conveyance was made to divest the appellant of title, he being a Texas resident, so that a rescission suit could be brought against the Franklins in a Federal district court with jurisdiction based on diversity of citizenship. Some of the Franklins resided in Texas and some in New Mexico. A rescission suit was then brought by the appellee against the Franklins in a Federal district court in Texas upon the claim that the pumps were defective.

In November of 1956, the appellee learned about the year's cotton sales and ascertained that the appellant had used her funds to pay his personal obligations. The venture began to lose its lustre. Relations between the parties became less amicable, but there was talk of a partnership cotton operation in 1957. In January of 1957, the parties entered into an agreement in writing which purported to define the relationships between them with respect to the pending rescission suit against the Franklins. Title to the land and purchase contract was to remain in the appellee. The rescission suit was not to be settled except with the approval of the two parties and their named attorneys, neither of whom is of counsel on this appeal. Expenses of litigation and any losses which might result from the "transaction" were to be divided equally. Should the appellee acquire any land as a result of or in settlement of the litigation, she was to convey half of it, together with attaching obligations and a lien securing the equity in her favor, to the appellant, who would execute a note for such equity payable out of crop realizations. At about the same time as the execution of the January agreement, the appellee wrote to the appellant's father outlining the business difficulties in which the appellant and she found themselves and delineating what she considered to be the best courses to follow to keep losses to a minimum. The language of the letter indicated that its author considered that a partnership had been formed in the spring of 1956 and that the January agreement provided for a division of the 898 acres should the land not be returned to the Franklins. During 1956, cotton tickets were designated "Teas & Ruddock" and the farm was commonly referred to in the area as the Teas-Ruddock farm. The appellee, upon receiving receipts from cotton sales from the appellant in November, 1956, spoke of the money as going into "our cotton kitty." For 1957, partnership accounts were set up by the appellee's accountant. Stationery was bought with the heading, "Teas and Kimball". Without obtaining the appellant's consent, the appellee dismissed the rescission suit. Prior to the dismissal, a $9,000 settlement offer was made by the Franklins and rejected by the appellee. The appellant had objected to the accepting of the settlement offer.

The action from which this appeal had its origin was commenced during the summer of 1957. The appellee instituted the action to recover (a) part of the $200,000, which she claimed had been converted by appellant to his own use; (b) money received by appellant from cotton brokers as advances on cotton crop earnings, which she charged had been converted by him to his own use instead of being paid over to her; and (c) certain sums owed to the appellee because of incidental transactions between the parties, which need not be discussed. The appellant answered, denying the allegations, and counterclaimed. Two counterclaims were put forth in the alternative, by one of which he sought a declaration that he and appellee were partners in the cotton venture, with half interest each in profits accruing therefrom, and that he had an undivided half interest in the lands; and asking for a partnership accounting and partition of the lands and for a money recovery on account of certain incidental transactions which are not here important. The second counterclaim was based upon an asserted agency relationship between the parties, in which the appellant sought compensation and costs owing to him as agent as offsets to any sums owed by him to the appellee. He also claimed security for his liability on the $180,000 of mortgage notes.

The trial was to a jury which answered special interrogatories submitted to it by the court, and the entry of judgment followed. Upon being instructed as to the general Texas law concerning what constitutes a partnership, the jury found that the relationship between the parties in regard to their 1956 cotton operation was that of partnership and not of principal and agent. So finding, it made no answer to the question concerning compensation for appellant as agent or as to telephone charges incurred by him for the appellee. It further found that by agreement of the parties the appellee was entitled to repayment of her $200,000 advance before appellant participated in the profits of the enterprise and determined that the appellant was entitled to no part of the profits, if any, derived from the 1956 operation. It also found that appellee settled the rescission suit without the appellant's approval. Other findings were made relating to the accounts owing by each to the other on items which need not here be considered.

Each side moved for judgment with respect to particular aspects of the case. The district court entered judgment determining that (a) by virtue of the deed of October 9, 1956, title to the land was in the appellee; (b) the parties were not partners in the 1956 farm operation, "she having been a married woman at the time the alleged partnership agreements were made and therefore being incapable as a matter of law of becoming a partner and having reaffirmed the relationship of principal and agent after her divorce on September 11, 1956, by the terms, provisions and recitations of the deed from Paul C. Teas, Jr. to Mrs. Mildred (Tweet) Kimball, dated October 9, 1956, and signed by her as well as by him"; (c) certain of the claims of each of the parties, which are not directly relevant to this appeal, were valid and allowed; and (d) that all relief sought which was not expressly granted was denied.

The appellant challenges those parts of the judgment described in (a) and (b) above. He also claims that there should have been a judgment on the partnership accounting aspect of the case and further asserts that he should have been adjudged entitled to a lien on the 898 acres, inferior to those already existing, to secure his liability on the $180,000 of purchase money liability. The appellee has attempted to raise two points on cross-appeal which will not be considered, since no cross-appeal was taken from the judgment of the district court.

The question concerning title to the land was not submitted to the jury. It was determined by the court. This was proper. The land was located in Texas and the law of that state must be applied in determining the title thereto. Colden v. Alexander, 141 Tex. 134,

171 S.W.2d 328; Commissioner of Internal Revenue v. Skaggs, 5 Cir., 1941, 122 F.2d 721. The land was conveyed to appellant in April of 1956. The efficacy of that deed is not challenged. The May agreement between the parties did not purport to transfer the legal title to the land and it was not in form sufficient to operate as a conveyance. The October deed transferred legal title to the land to the appellee. It was recorded pursuant to Texas law on January 21, 1957. The agreement of January 7, 1957, recognized title to be in appellee and stated that it should remain in her. The appellant no longer contends that the October deed should be ignored or set aside. Instead, he argues that by the agreement of January 7, 1957, the appellee agreed that should the land not be returned to the Franklins in the rescission suit she would convey half of it to appellant. That since the suit was settled and she kept the land, the appellant is, he claims, entitled to a conveyance in accordance with the agreement and the court improperly refused to submit to the jury a question asking whether or not appellant was so entitled. Therefore, says the appellant, the case should be reversed so that findings may be made that the appellant is so entitled and that the appellee is not possessed of a fee title. Part of the argument falls of its own weight, as an equitable right to specific performance of a promise to convey is not the same as legal title. Furthermore, the request for submission to the jury of questions of construction and interpretation of the integrated written agreement was properly denied. See United States v. Nickel, 10 Cir., 1957, 243 F.2d 924, 925; 10-A Tex.Jur. 405 et seq., Contracts § 198; 3 Corbin on Contracts 123, § 554. The part of the agreement here material reads as follows:

"In the event that any lands are acquired by Tweet Kimball as a result of such litigation [with the Franklins] or as a result of a settlement of the litigation, Tweet Kimball agrees that she will upon acquiring title to such lands, convey one half of the productive land and one half of the nonproductive (or poor) land to Paul C. Teas, Jr., who will assume one half of the notes outstanding and secured by a lien on such land and he will execute a note payable to Tweet Kimball in the amount of one half of the cost of such equity in the land to Tweet Kimball which note shall bear interest at the rate of 6% per annum and shall be payable as follows:

"The net proceeds from the crops grown on the land each year shall be applied to,

"1. The payment of one-half of any annual payments due on purchase money notes.

"2. The payment of principal and interest on the note so given to Tweet Kimball."

██ Read alone, or in conjunction with the prior provision in the agreement which states that title to the land should remain in the appellee, it is apparent that the language applies only to land which the appellee might subsequently acquire and not to the land which the agreement treats as being owned by her. The appellant, at the trial, offered evidence to show that, in fact, the language was intended to include the land described in the October deed, the strongest of such evidence being the appellee's letter to the appellant's father. The evidence was received as was testimony by the appellee that the quoted language meant what is said and that the reference was to land which it was expected the Franklins would offer in lieu of money in settlement of the rescission suit. Upon all the evidence, the court held that appellee held fee simple title to the land and that appellant was not entitled to a conveyance of a half interest in property as sought in his motion for judgment. We agree with the trial court. The extrinsic evidence was inadmissible to vary the language of the agreement. See 32 C.J.S. Evidence § 959, pp. 896, 900; 17 Tex.Jur. 791, Evidence § 352.

██ Raised but not briefed on appeal is the question whether the deed of

October 9, 1956, was invalid because executed primarily in order to create a title situation in which Federal diversity jurisdiction could be invoked with respect to the rescission suit which followed. The deed recited other reasons for the conveyance, but extrinsic evidence was introduced to show that the real reason was as just stated. In Texas, as elsewhere, extrinsic evidence is not admissible in such a situation to defeat the conveyance by varying the provisions of the deed. Kahn v. Kahn, 94 Tex. 114, 58 S.W. 825; Davis v. Davis, 141 Tex. 613, 175 S.W.2d 226; 9 Wigmore on Evidence, 3d Ed. 108–111, § 2433. As between the parties to the transaction, there was no fraud or mistake which would justify resort to extrinsic evidence under the fraud exception to the rule just stated.

The question of whether or not the parties were partners with respect to the 1956 operation is difficult. The jury found that as a matter of fact they were partners. The court determined that as a matter of law they were not. The appellee was domiciled in Colorado. The appellant resided in Texas. The March agreement was made in Texas. The one of May 10 apparently became effective in Colorado. All other agreements and deeds were made in Texas and the land was located in that state. The cotton operation was to be conducted on the land. The attack on the validity of the partnership is based on the alleged incapacity of the appellee as a married woman to enter into a partnership agreement under Texas law prior to her divorce. It is agreed that under Colorado law a married woman could become a partner. Thus at the outset we must determine whether appellee's capacity to enter into the partnership agreement was governed by the law of Colorado or of Texas.

■■■■■■ In an action based on diversity of citizenship, and this is such a case, a Federal district court is required, under Klaxon Co. v. Stentor Electric Mfg. Co., 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477, to apply the conflict of law rules of the state in which it is sitting. Therefore the Texas conflict of laws rules will supply the test by which we determine whether the validity of the purported partnership agreement is to be ascertained under the laws of Texas or of Colorado.

■■■■■■ The specific element of validity with which we are concerned is the capacity of appellee as a married woman to make such a contract. In Texas, capacity to contract appears to be governed by the same law which governs the validity of the contract as a whole. See Ryan & Co. v. Missouri, K. & T. Ry. Co., 65 Tex. 13, 57 Am.Rep. 589. That law is ordinarily the place of contracting 9 Tex. Jur. 360, 362, Conflict of Laws, §§ 9, 10. However, if a contract specifies that it is to be performed wholly in a particular place, then the presumption is that the parties intended to be governed by the law of that place, and such law will govern. 9 Tex.Jur. 364, Conflict of Laws, § 10; Cockburn v. O'Meara, 5 Cir., 1944, 141 F.2d 779. If the parties specify in the contract that the contract is to be governed by the law of a particular place, that law will govern if it has a reasonable relationship to the contract. 9 Tex. Jur. 363, 364, Conflict of Laws, § 10. A general presumption is that the parties intended to enter into a valid and binding agreement, and therefore where there is a choice which can reasonably be made between applying a law that will defeat the contract and one which will uphold it, the latter will be applied. Grace v. Orkin Exterminating Co., Tex.Civ.App., 255 S.W.2d 279; 9 Tex.Jur. 364, Conflict of Laws, § 10.

■■■■■■ Inasmuch as a person's domicil does not appear to have independent significance concerning capacity to contract under Texas conflict of laws rules, the oral agreement concerning partnership which the parties made in March of 1956 was not valid if proscribed by the law of Texas. The written partnership agreement of May 10, 1956, is on a somewhat different footing, as the appellee entered into it in Colorado. The partnership business was to be carried on primarily,

and probably entirely, in Texas, and although relationships between the parties under the agreement might possibly extend beyond that state it is apparent that the focus of the contract was so centered in Texas that its validity should be determined by the laws of contract of that state. Therefore, we confine our consideration to Texas law in determining whether or not a valid partnership was established. Were there stronger ties with Colorado expressed in the May agreement, the rule in favor of using the law supporting validity might be invoked, but the only tie here which could be considered relevant is the fact that the appellee signed the instrument in Colorado, and the evidence does not indicate that at the time of contracting the parties considered the place of signing to be of any consequence. The document was drafted in Texas on a Texas farm, pertained to Texas land, and sought to formalize a relationship to operate a business in Texas. In such circumstances, the Texas conflicts rule requires that the validity of the agreement and the capacity of the parties be determined by its law.

 Under Art. 4614, Vernon's Ann.Civ.Stat., married women in Texas have been accorded extensive powers to act concerning their separate property. Bearden v. Knight, 149 Tex. 108, 228 S. W.2d 837; Hawkins v. Britton State Bank, 122 Tex. 69, 52 S.W.2d 243; Huie, The Community Property Law of Texas, 13 Vernon's Ann.Civ.Stat. VII, XXXVII et seq., cf. Hammond v. Smidth, Tex. Civ.App., 286 S.W.2d 654. However, the Texas courts have been consistent and definite in holding that a married woman who has not had her disabilities of coverture removed pursuant to Art. 4626, Vernon's Ann.Civ.Stat., is incapable of entering into a mercantile partnership. King v. Matney, Tex.Civ.App., 259 S.W. 2d 606; Jung v. Dallas Tailor & Laundry Supply Co., Inc., Tex.Civ.App., 256 S. W.2d 703. See Dillard v. Smith, 146 Tex. 227, 205 S.W.2d 366; J. B. Hirshfeld & Co. v. Evans, 127 Tex. 254, 93 S.W.2d 148. The rule is somewhat relaxed in

the case of a woman permanently separated from her husband. Cauble v. Beaver-Electra Refining Co., 115 Tex. 1, 274 S.W. 120. No relaxation of the rule will be made unless the separation is clearly shown to be of a permanent nature. Finks v. Thompson, 11 Tex.Civ. App. 538, 32 S.W. 711. Implicit in the judgment is an implied finding that the admitted estrangement of appellee from her husband at the time the so-called partnership agreement was executed was not shown to be a permanent separation. Rule 49(a), Fed.R.Civ.Proc. 28 U.S.C.A. The evidence sustains such implied finding.

 The attempts in March and May of 1956 to form a partnership for the operation of a cotton ranch were invalid and ineffective under the Texas law. There was evidence that the business relationship begun in the spring of 1956 continued beyond appellee's divorce and through the year 1956. However, the appellant's counterclaim did not assert that a partnership was created after the divorce and the evidence does not support such a claim. Since the purported partnership contract or contracts made during the appellee's coverture have no legal existence, it cannot be said that a valid partnership contract was ever entered into by the parties with respect to the 1956 cotton operation.

 The appellant claims that if Texas law prevented the appellee from becoming a partner during coverture, her purported contract in that regard was voidable but not void, and that her actions following her divorce ratified the agreement previously concluded. Were the agreement made during coverture merely voidable, it might well be that the continuation of the enterprise following divorce would have constituted ratification. Ordinary contracts of married women during coverture in Texas are considered to be voidable rather than void. Leake v. Saunders, 126 Tex. 69, 84 S.W.2d 993. The woman is bound unless she interposes the defense of coverture and the other party is bound unless and until the defense of coverture is

raised. 23 Tex.Jur. 232, Husband and Wife, § 200. However, under the Texas decisions, a partnership contract differs from most other contracts. This is so, at least in part, because such a contract creates a continuing relationship which can only be carried on if both parties have general contractual capacity. A married woman lacks such capacity. It appears clear from a reading of the Texas decisions that a purported partnership agreement, invalid because of coverture, is void, not voidable, and creates no obligations between the parties. King v. Matney, supra; Jung v. Dallas Tailor & Laundry Supply Co., Inc., supra; Dillard v. Smith, supra; 23 Tex.Jur. 305–307, Husband and Wife, §§ 267, 268. A void contract cannot be made effective by ratification and appellant's argument in this regard must fail.

The appellant contends that the judgment below should have included a partnership accounting, for which prayer was made in the counterclaim alleging that a partnership existed. Having decided against the appellant's partnership contention, it follows that a partnership accounting would not have been proper. Finally, the appellant asks indemnification concerning the obligations assumed by him when the land involved in this suit was purchased, such indemnification to be in the form of a mortgage upon such property inferior to the outstanding liens against it. The appellant urges that the simple ends of justice require such action. We do not reach such a conclusion. The appellant acquired title to the property, although it seems he did so as agent for the appellee. Upon the transfer of title to the appellee and the assumption by her of the secured obligations she became, at least as between the appellant and herself, primarily liable on the notes. Straus v. Brooks, 136 Tex. 141, 148 S.W.2d 393; 59 C.J.S. Mortgages § 416 c, p. 606. In the event the appellant is required to pay the mortgage debt the doctrine of equitable subrogation will be applied and the lien may be kept alive for his protection. Davis v. Leaverton, Tex.Civ.App., 21 S.W.2d 369;

Restatement, Restitution, § 104. To require the appellee to give the appellant a mortgage to indemnify him against liability would result in duplicating the liens for the securing of the indebtedness. To this the appellant is not entitled.

For the reasons stated, the judgment of the district court is

Affirmed.