**ALLIED OIL WORKERS UNION**

v.

**ETHYL CORPORATION.**

Civ. A. No. 2334.

United States District Court
E. D. Louisiana,
Baton Rouge Division.

July 5, 1963.

R. W. Williams, Jr., Baton Rouge, La., for plaintiff.

C. W. Phillips, Taylor, Porter, Brooks, Fuller & Phillips, Charles Kyle, Baton Rouge, La., for defendant.

WEST, District Judge.

*REASONS FOR JUDGMENT*

This suit seeks a declaration of the rights of the plaintiff union and the obligations of the respondent company under the terms of a collective bargaining agreement, together with an order compelling respondent company to perform certain alleged duties under this agreement. More specifically, petitioner, Allied Oil Workers Union, contends that under the terms of the collective bargaining agreement, the respondent company, Ethyl Corporation, has no right to draft member employees for overtime work, that is, work in addition to the regularly scheduled working hours of those employees. The union claims, in fact, that the agreement specifically prohibits the company from doing so. The company, on the other hand, contends that the collective bargaining agreement is simply silent on that point, and that since it does not provide in any way for or against drafting for overtime work, the company does have the inherent right to do so. Respondent company points out that this particular collective bargaining agreement is unique in that while grievance procedures are provided for, there is no compulsory arbitration required and that after grievance procedures are exhausted, unless there is a mutual consent to arbitrate, self-help, such as strike, or other economic pressures must be resorted to in order to settle the dispute. Consequently, respondent company contends that since, in this case, the company has refused to arbitrate, petitioner's only remedy is to resort to self-help for a resolution of the dispute, and that for this Court to undertake to resolve their differences would be tantamount to forcing arbitration of the dispute contrary to the terms of the collective bargaining agreement.

After a careful study of the testimony taken in this case, and after considering the briefs and arguments of counsel, this Court concludes that respondent company's position is well taken.

The collective bargaining agreement involved here was originally entered into

between petitioner union and respondent company on June 2, 1956. According to its terms it is automatically renewed each year on its anniversary date for another twelve months unless certain prescribed steps are taken for its termination. No such steps have been taken, and the agreement has remained in full force and effect from its inception to the present time.

This agreement is somewhat unique in that it specifically provides that:

"In the event that differences arise between the COMPANY and the UNION as to the meaning of any provision of this Agreement, which are not settled through the Grievance Procedure, such differences may be submitted to arbitration provided the COMPANY and the UNION mutually agree to do so. Disputes arising out of the termination of an employee because of non-occupational disability which are not settled through the Grievance Procedure may also be submitted to arbitration, provided the COMPANY and the UNION mutually agree to submit same to arbitration. Neither the COMPANY nor the UNION shall be compelled to agree to arbitrate any difference or any termination. Wages and rates of pay and the COMPANY'S Benefit Plans shall not be subjects for arbitration."

The agreement does not contain a no-strike clause, thus reserving to the union the right to refuse to arbitrate a dispute and, after grievance procedures are exhausted, to strike if it so desires.

On several occasions during the months of March and April of 1960, the company drafted certain employees, and insisted upon their working overtime despite their protests. The plaintiff union thereafter filed grievances with the respondent company in accordance with the procedures provided in the collective bargaining agreement, and requested the company to arbitrate. The company rejected the grievances and refused to arbitrate and the plaintiff union brought this suit.

It appears from the evidence that prior to 1958 the company did not, in fact, exercise any right to draft employees for overtime work. The union contends that the mere fact that the company did not attempt to draft employees for overtime work between 1956 and 1958 clearly establishes the fact that both the company and the union recognized that no such right of draft existed, and that such recognition by both parties now forms a part of the agreement, and therefore, the company is, by the provisions of said agreement, without such a right. There is nothing in the evidence to even indicate, however, that there was any need for drafting overtime labor between 1956 and 1958. It appears that due to ample available manpower during that time, the company was able to obtain sufficient overtime labor on a voluntary basis. Since 1958, the company has consistently maintained that it did have the right to draft employees represented by the plaintiff union for overtime work when conditions warranted such action and that the exercise of such a right by the company did not constitute a violation of any agreement between the company and the union. As a matter of fact, between 1958 and 1960, the company on many occasions drafted labor for overtime work. Grievances were filed by the union on several occasions protesting such drafting, and in each instance, the company rejected the grievance on the asserted ground that it did have the absolute right to draft and that its right to draft was in no way precluded by any provision of the collective bargaining agreement. No further action was taken by the union in connection with grievances after the company's position was asserted, and it was not until March and April of 1960, when further drafts were enforced by the company, that the union decided to litigate this matter. The plaintiff bases its contention primarily on Article IV, Paragraph K, of the collective bargaining agreement, found on Page 21 thereof, which reads as follows:

"K. There will be a separate Overtime Book with an accurate rec-

ord of all overtime worked and refused kept in each department. Overtime will be computed daily to the nearest one-quarter (¼) of an hour. The overtime records will be available to the UNION at any time."

The union contends that because this quoted section of the collective bargaining agreement refers to overtime "refused", it becomes obvious that the employees have the right to refuse to work overtime. It then reasons that if the employee may refuse to work overtime, the conclusion is inescapable that the company does not have the right to draft for overtime work. This conclusion does not follow from the quoted section of the agreement, nor from the agreement as a whole. Furthermore, the past actions of both the company and the union in this regard clearly indicate that neither intended such a conclusion. Article IV of the collective bargaining agreement refers to hours and overtime work. It sets forth the manner in which overtime work, when available, will be distributed among the qualified employees. These provisions pertain to voluntary overtime work only. Paragraph K under Article IV simply provides that a record be kept of the overtime worked by employees and the overtime which has been offered to employees but refused. The purpose of this provision is simply to have a record of the overtime that has been offered to an employee and refused by him so that this offered overtime may be charged against that employee when it comes to future allotment of overtime work. This is obviously designed to prevent an employee from refusing an undesirable overtime assignment and still remaining in line to be offered a more desirable assignment. It has nothing to do with the right of the company to draft employees for involuntary overtime work. It neither grants them that right nor denies it.

■ That this fact is true is obvious from the entire record in this case. The record clearly shows from the testimony of Mr. Rogers, the union president, that no agreement was ever reached between the company and the union concerning overtime procurement procedures from as far back as 1952. This question had been debated and discussed on many, many occasions between the company and the union with the company always insisting upon the inclusion in the collective bargaining agreement of a right to draft clause and the union always contending that the employees had a right to refuse assigned overtime work. Consequently, when the collective bargaining agreement was finally entered into on June 2, 1956, there was simply no provision made for the forced procurement of overtime work. Thus, the absence of agreement on this point leaves the company with the right to demand overtime work, and if objected to by the union, leaves the union with its right to resort to self-help, including strike, as they may see fit. United Steelworkers of America v. Warrior & Gulf Navigation Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409; United Steelworkers of America v. American Manufacturing Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403; C. G. Conn, Ltd. v. N. L. R. B., 7 Cir., 108 F.2d 390; Anaconda Co., 39 LA 699; International Salt Co., 35 LA 306.

By bringing this suit in an effort to have this Court declare the rights of the union and the obligations of the company under the provisions of the collective bargaining agreement, the union is attempting to do by indirection that which it cannot do directly. It is, in effect, attempting to inject a compulsory arbitration provision into the collective bargaining agreement by selecting the Court as the arbitrator and thus, forcing an arbitration of this dispute.

■ At each anniversary date of this agreement, both sides have had an opportunity each year since 1956 to incorporate into the agreement a compulsory arbitration clause, together with a no-strike provision. This both parties have consistently failed or refused to do. Collective bargaining agreements regu-

late or restrict the exercise of management insofar as is provided specifically by such agreement. A collective bargaining agreement treats of certain specific areas, and where such areas are not included, management still retains the right to act as it sees fit, subject, of course, to the possibility of work stoppages or other economic pressures that may be brought by the union. United Steelworkers of America v. Warrior & Gulf Navigation Co., supra.

It is the opinion of this Court that where it is conclusively shown, as it is in this case, that the collective bargaining agreement does not provide for final and binding arbitration, but does provide for grievance procedures, that after the grievance procedures are exhausted, neither party is bound to arbitrate and each must resort to self-help in adjusting their dispute, and that consequently, plaintiff's complaint fails to state a claim upon which relief can be granted by this Court. However, even though this Court is convinced that plaintiff's complaint shows no claim upon which relief can be granted, nevertheless, it feels bound to say that even if it should have been held, or might in the future be held that the union does have the right to maintain this action, the testimony and the record clearly show, without any doubt whatsoever, that there is simply no provision made in the collective bargaining agreement for either granting to the company or withholding from it the right to draft employees for overtime work. Thus, in the absence of the inclusion of such a provision, the company is entitled to demand that employees work overtime when the necessity arises and should such demands not meet with the approval of the employees or their representative union, that dispute must be resolved by necessary amendments to the collective bargaining agreement brought about by negotiations, induced by the application of self-help, consisting of whatever economic pressures either party may lawfully bring to bear upon the other. Until such drafting procedures are either

provided for or specifically prohibited, the company's right to require overtime of its employees must be maintained. For these reasons, the demands of the petitioner, Allied Oil Workers Union, must be denied and this suit dismissed.