In the Matter of **BATH MARINE DRAFTSMEN'S ASSOCIATION, Plaintiff,**

v.

**BATH IRON WORKS CORPORATION, Defendant.**

**Civ. No. 8–105.**

United States District Court
D. Maine, S. D.
March 31, 1967.

Theodore H. Kurtz, Sidney W. Wernick, Portland, Me., for plaintiff.

Daniel T. Drummond, Jr., Portland, Me., John P. Carey, Bath, Me., for defendant.

## OPINION AND ORDER OF THE COURT

GIGNOUX, District Judge.

This is an action under the Federal Declaratory Judgments Act, 28 U.S.C. § 2201 (1964), and Section 301 of the Labor Management Relations Act of 1947, as amended, 29 U.S.C. § 185 (1964), seeking a declaratory judgment that the collective bargaining agreement between the plaintiff, Bath Marine Draftsmen's Association, and the defend-

ant, Bath Iron Works Corporation, dated October 31, 1963 has been since September 1, 1964, and now is, legally binding upon the defendant in relation to those former employees of the Hyde Windlass Company who as an incident of the merger of the Hyde Windlass Company into the defendant on September 1, 1964 became employees of the defendant, and who have been employed by the defendant as draftsmen, material order clerks, plan clerks, and in other capacities in the drafting and technical departments of the defendant (exclusive of stenographers, stenographic clerks, guards, engineers and supervisors).

The facts are not disputed and can be briefly stated. Bath Iron Works Corporation is a Maine corporation engaged principally in shipbuilding. Since August 1940 Bath has recognized the Bath Marine Draftsmen's Association as the exclusive bargaining representative for certain of its employees. The most recent collective bargaining agreement between Bath and the Association, effective from October 31, 1963 to April 18, 1967, covers a unit defined as "those employed by the BIW as laboratory technicians, radiographers, draftsmen and all others employed in the Drafting and Technical Departments, excluding stenographers, stenographic clerks, guards, engineers and supervisors within the meaning of the National Labor Relations Act, as amended * * *." The unit in question contains approximately 100 employees, of whom 70–75 are draftsmen.

The Hyde Windlass Company was organized as a Maine corporation prior to 1900 and has ever since been engaged in the design and fabrication of marine deck and industrial equipment. In 1961 Bath purchased all of the outstanding stock of Hyde and thereafter operated Hyde as a wholly-owned subsidiary. On

January 24, 1962, pursuant to a consent election, the National Labor Relations Board certified the Association as the exclusive bargaining representative for Hyde's employees in a unit described as "those employees in the Engineering Department of the Company, including draftsmen, material order clerks and plan clerks, excluding all production and maintenance employees, all office clerical employees, professional employees, guards, supervisors as defined in the National Labor Relations Act, as amended." Hyde and the Association thereupon entered into several collective bargaining agreements with respect to these employees, the most recent of which was made effective from November 15, 1963 to March 8, 1967. About 30 to 35 employees are contained in this unit, of whom 20 to 25 are draftsmen.

On September 1, 1964 during the effective terms of both of the above contracts, Hyde merged with Bath and ceased to do business as a separate corporate entity. Since the merger, Bath has continued the Hyde operation without significant change, employing in its Hyde division substantially all of the production, office and supervisory personnel who were formerly employed by Hyde.[1]

Following the merger, on September 2, 1964, Bath notified the Association that Bath was assuming the obligations of Hyde's collective bargaining agreement with the Association. On September 4, 1964 the Association advised Bath of the Association's position that the Hyde agreement had been terminated by the merger, and that since the former Hyde employees were now employed by Bath, they were automatically covered by the agreement between Bath and the Association.[2] No satisfactory solution

1. Although the Hyde plant is geographically situated contiguous to the Bath yard, Hyde maintains its own security force, payroll, personnel office, purchasing department, engineering department and management team. The Hyde draftsmen continue to work in the same building in the Hyde plant where they worked prior to the merger, which building is 1500 feet from the building in which the Bath draftsmen work.

2. The majority of Hyde's employees were included within a production and maintenance collective bargaining unit represented by the Industrial Union of Marine and Shipbuilding Workers of America,

having been reached, the Association brought the present action for a declaratory judgment on November 25, 1964.[3]

■ An initial question is presented by defendant's suggestion that this Court is without jurisdiction of the action under Section 301 because of plaintiff's failure to exhaust the arbitration procedures provided by its contract.[4] Defendant concedes that if its contractual right to insist on arbitration can be waived, it has been.[5] Defendant contends, however, that resort to the arbitration procedures in a collective bargaining agreement is a condition precedent to judicial relief and may not be waived by the parties. Defendant cites no direct authority to support this proposition, but relies upon the federal labor policy favoring arbitration, when agreed upon by the parties, as the preferred method for resolving disputes arising under collective bargaining agreements, as declared by the Supreme Court in the line of cases commencing with *Lincoln Mills* and continuing through the *Steelworker* cases to *Drake Bakeries* and *Wiley*. Textile Workers Union of America v. Lincoln Mills, 353 U.S. 448, 77 S.Ct. 912, 923, 1

L.Ed.2d 972 (1957); United Steelworkers of America v. American Mfg. Co., 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); United Steelworkers of America v. Enterprise Wheel & Car Corp., 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960); Drake Bakeries, Inc. v. Local 50, American Bakery and Confectionery Workers, 370 U.S. 254, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962); John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964).

■ . In the *Lincoln Mills* line of cases, however, unlike the present case, one of the parties was demanding arbitration under an agreement which required arbitration of the subject matter of the suit. In such circumstances, the Supreme Court held that there first must be recourse to the arbitration procedures provided by the contract before judicial relief may be sought. *Lincoln Mills* and its progeny do not suggest that arbitration is in all cases a condition precedent to the jurisdiction of a federal district court under Section 301. Indeed, in At-

AFL-CIO, and its Local 81, which had been certified by the National Labor Relations Board as the bargaining representative of Hyde's production and maintenance employees. After the merger, Bath and the Industrial Union agreed to accept and adopt the collective bargaining agreement between Hyde and the Industrial Union with respect to the production and maintenance employees formerly employed by Hyde.

3. Defendant makes no contention that this Court lacks jurisdiction under Section 301 of the Labor Management Relations Act to grant declaratory relief under the Federal Declaratory Judgments Act. Weyerhaeuser Co., Shipping Container Division v. International Bhd. of Pulp Workers, 190 F.Supp. 196 (D.Me.1960); Black-Clawson Co., Paper Mach. Division v. International Ass'n of Machinists, 313 F.2d 179, 181 (2d Cir. 1962); Allied Oil Workers v. Ethyl Corp., 341 F.2d 47, 49 (5th Cir. 1965); Desert Coca Cola Bottling Co. v. General Sales Drivers, 335 F.2d 198 (9th Cir. 1964).

4. The Bath agreement contains a typical provision for arbitration of disputes aris-

ing thereunder. The parties agree that the present dispute is arbitrable under the contract. Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 84 S.Ct. 401, 11 L.Ed.2d 320 (1964).

5. The record discloses that prior to the institution of the present action the parties expressly agreed to forego arbitration and to submit to this Court the question of liability under the Bath contract. Furthermore, the complaint in this action was filed on November 25, 1964; defendant's answer was filed on December 18, 1964; pre-trial conferences were held on January 27, 1965 and on June 6, 1966; and trial was had on September 14, 1966. It was not until oral argument on January 25, 1967, more than two years after suit was begun, that defendant first raised the present issue. Under such circumstances, it can hardly be said that defendant has "proceeded with dispatch in seeking arbitration." E. T. Simonds Constr. Co. v. Local 1330 of Int'l Hod Carriers Union, 315 F.2d 291, 295 (7th Cir. 1963). Cf. Drake Bakeries, Inc. v. Local 50, American Bakery and Confectionery Workers, 370 U.S. 254, 266–267, 82 S.Ct. 1346, 8 L.Ed.2d 474 (1962).

kinson v. Sinclair Ref. Co., 370 U.S. 238, 82 S.Ct. 1318, 8 L.Ed.2d 462 (1962) the Supreme Court held that the company had no duty to resort to arbitration before bringing suit for breach of a labor contract since the arbitration clause in question only allowed the union, and not the company, to request arbitration. And in Smith v. Evening News Ass'n, 371 U.S. 195, 83 S.Ct. 267, 9 L.Ed.2d 246 (1962) the Court held that a suit by an individual employee, seeking damages for breach of a collective bargaining contract between his union and his employer, could be maintained in the federal courts under Section 301 because "[t]here was no grievance arbitration procedure in this contract which had to be exhausted before recourse could be had to the courts." Id. at 196, n. 1, 83 S.Ct. at 268. See Allied Oil Workers v. Ethyl Corp., 341 F.2d 47 (5th Cir. 1965). It is clear from these cases that a federal district court has jurisdiction of a suit for violation of a collective bargaining agreement containing no operative provision for arbitration. Since "arbitration is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit", United Steelworkers of America v. Warrior & Gulf Nav. Co., supra 363 U.S. at 582, 80 S.Ct. at 1347, 1353; John Wiley & Sons, Inc. v. Livingston, supra 376 U.S. at 547, 84 S.Ct. at 909, no reason appears why the parties may not mutually agree to waive their right to arbitration. E. T. Simonds Constr. Co. v. Local 1330 of Int'l Hod Carriers Union, 315 F.2d 291 (7th Cir. 1963). The Court, therefore, concludes that the parties' failure to utilize the contract grievance procedures does not preclude plaintiff's right to maintain the present action.

This conclusion is completely consistent with the recent decision of the Court of Appeals for the Eighth Circuit in Woody v. Sterling Aluminum Prods. Inc., 365 F.2d 448 (8th Cir. 1966). In Woody the court held that an individual employee was precluded from maintaining an action for violation of a collective bargaining agreement because of his failure to exhaust the contract grievance procedure agreed upon by the union and the employer as the means of resolving disputes arising under the contract. Id. at 452–453. Woody is no more than an application of the well settled principle that where a collective bargaining agreement provides for extra judicial means of resolving disputes which arise under the agreement, an individual employee who seeks redress and who wishes to act independently of his union must attempt to use the contract grievance procedures agreed upon by the union and the employer before seeking relief in the courts. Republic Steel Corp. v. Maddox, 379 U.S. 650, 85 S.Ct. 614, 13 L.Ed.2d 580 (1965); Belk v. Allied Aviation Serv. Co., Inc., 315 F.2d 513 (2d Cir.), cert. denied, 375 U.S. 847, 84 S.Ct. 102, 11 L.Ed.2d 74 (1963). Compare Smith v. Evening News Ass'n, supra. Woody is clearly inapplicable to an action by the union against the employer. There is no suggestion in Woody that the two parties to a collective bargaining agreement may not mutually agree to resort to the courts to resolve a dispute arising under the agreement, rather than to use the contract grievance procedures.

On the merits, the single issue presented in this case is whether, as plaintiff contends, the collective bargaining agreement of October 31, 1963, between Bath and the Association covers and is legally binding upon the defendant with respect to those draftsmen who were formerly employed by Hyde, but who as a consequence of the merger are now employed by Bath. This ultimate issue, however, subdivides into two subsidiary issues: first, whether, as a matter of contract interpretation, the Bath contract in terms applies to the former Hyde draftsmen; and second, whether even if the Bath contract does in terms apply to the Hyde draftsmen, the preexisting Hyde contract, as a matter of federal labor policy, survives the merger as a viable contract, the provisions of which are exclusively controlling with

respect to this group of Bath's employees.

On the first question, the language of the Bath contract is clear and explicit. Article I of that contract defines the persons who are covered by the contract as: "those employed by the BIW as * * * draftsmen and all others employed in the Drafting and Technical Departments, excluding stenographers * * *." The Hyde draftsmen are "employed by the BIW." Further, they are employed by the BIW "as * * * draftsmen." In addition, the record discloses that they are employed by the BIW in a "Technical Department." And admittedly, the contract was intended to cover not only those employed in the bargaining unit at the time the contract was executed, but also those subsequently so employed during the term of the contract. Thus, plainly and unambiguously the language of the Bath contract on its face includes the Hyde draftsmen among those persons to whom the contract was intended to apply.

Defendant seems to argue that the Bath contract must be interpreted to exclude the Hyde draftsmen from coverage because the parties could not have intended that the draftsmen employed by Hyde, which was at the time a separate corporation, be included in the Bath unit. Obviously, the parties intended that the Bath contract cover only those draftsmen who might be employed by Bath during the effective life of the contract. It certainly does not follow, however, that the parties did not intend the contract to cover any draftsmen who might subsequently be employed by Bath, regardless of whether they were previously employed by Hyde or by any other corporation.

The defendant also contends that the word "draftsmen," as it appears in the Bath contract, was not intended by the parties to include all types of draftsmen, but only to apply to the particular kind of draftsman which was employed by Bath at the time the contract was executed. In this respect, the record shows that the Hyde draftsmen, both before and since the merger, have been "component" draftsmen, whereas the bulk of the draftsmen employed by Bath have been "systems" draftsmen.[6] Defendant argues that the parties did not intend by the use of the word "draftsmen" in the Bath contract to include any draftsmen other than systems draftsmen such as those then employed by Bath. The Court cannot agree.

In the first place, the evidence shows that both before and since the merger Bath has employed draftsmen who were not systems draftsmen,[7] and it is conceded that these draftsmen are included in the Bath bargaining unit. In the second place, the bargaining unit defined in the contract expressly includes, in addition to draftsmen, "laboratory technicians, radiographers [8] * * * and all others employed in the Drafting and Technical Departments * * *." The defendant has been able to advance no reasonable explanation as to why the parties would have used the generic term "draftsmen," without qualification, in their description of a bargaining unit which includes persons doing so many different types of work, and yet have intended to exclude certain types of draftsmen from the unit. In sum, the plain language used by the parties in the Bath contract compels the conclusion that it was intended to apply to all persons who became employed by Bath as

6. While the distinction between "component" draftsmen and "systems" draftsmen is far from clear, it would appear that "component" draftsmen, or "machinery" draftsmen as they are sometimes called, lay out and design items of machinery, which may or may not become units in an integrated system, such as the electrical, water or fire control systems in a vessel. "Systems" draftsmen are principally concerned with the lay out and design of the systems as such.

7. For example, the draftsmen in Bath's maintenance department are neither systems nor component draftsmen.

8. The record discloses that there are presently six to eight radiographers who are included in the Bath bargaining unit.

draftsmen, or otherwise in Bath's drafting and technical departments, during the term of the contract, regardless of the particular kind of drafting work they might do, and regardless of whether they had previously been employed by Hyde or by any other employer.

The remaining question is whether there is any principle of federal labor policy by virtue of which the Hyde contract survived the disappearance of Hyde as a separate entity, and supersedes the Bath contract as the sole contract which is binding upon the parties with respect to the Hyde draftsmen.[9] Defendant argues that the recent decision of the Supreme Court in John Wiley & Sons, Inc. v. Livingston, 376 U.S. 543, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964), establishes such a principle. Analysis of *Wiley*, however, discloses that it has no significant application to the instant case.

In the *Wiley* case, Interscience Publishers, Inc., a small publishing company, merged with a larger publisher, John Wiley & Sons, Inc., and ceased to do business as a separate entity. Following the merger, Wiley, which did not have a union, closed the former Interscience plant and transferred the Interscience employees to Wiley's own larger plant. The union which represented the Interscience employees under a collective bargaining agreement at the time of the merger demanded that Wiley respect certain rights set out in the Interscience contract. Wiley refused, and the union sued under Section 301 to compel arbitration of the issues presented, as required by the terms of the Interscience agreement. The Supreme Court held that under these circumstances—where there was substantial similarity of operation and continuity of identity of the business enterprise before and after the change in ownership, and where Wiley did not have a collective bargaining agreement with any union covering the transferred employees—Interscience's contractual obligation to arbitrate under its collective bargaining agreement was, by reason of national labor policy, binding upon Wiley.[10] Significantly, the Supreme Court in *Wiley* held only that the predecessor employer's duty to arbitrate carried over to bind the successor employer, and the Court expressed no view on the extent to which the substantive provisions of the prior agreement survived the merger, apparently leaving that determination for the arbitrator. United

9. As plaintiff points out, and defendant does not seriously contest, Bath's unilateral action in accepting Hyde's contractual obligations under the Hyde agreement without the consent and against the will of the Association was, under traditional common law principles, a nullity insofar as Bath was seeking thereby to obtain the benefits, and not merely to assume the obligations, of the Hyde contract. Wiley, supra 376 U.S. at 550, 84 S.Ct. at 909. Absent a common law novation, which requires mutual consent, it is elementary that Bath could not unilaterally substitute itself in place of Hyde as a party to the Hyde contract and thereby obtain rights under the contract as against the Association, which was the other party thereto. See 4 Corbin, Contracts § 866 (1951); 3 Williston, Contracts § 418 (3d ed. 1960); Restatement, Contracts § 160 (1932).

10. In the brief period since Wiley was decided, three Courts of Appeals have had occasion to consider its scope. In United Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891 (3d Cir. 1964) and Wackenhut Corp. v. International Union, United Plant Guard Workers, 332 F.2d 954 (9th Cir. 1964), the Wiley principle was applied to compel a successor employer, which had no union, to arbitrate grievances pursuant to the provisions of a collective bargaining agreement of a predecessor employer, where the transfer of the business enterprise had been accomplished by a sale of the business, instead of by a merger. On the other hand, in McGuire v. Humble Oil & Ref. Co., 355 F.2d 352 (2d Cir.), cert. denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966), Wiley was held not to be applicable where there was another union representing the employees of the purchasing corporation, which had been certified by the National Labor Relations Board as the bargaining representative of the transferred employees.

Steelworkers of America v. Reliance Universal, Inc., 335 F.2d 891, 894–895 (3d Cir. 1964).

The critical difference between the present case and *Wiley* is that in *Wiley* the successor employer did not have a collective bargaining agreement with any union covering the employees who were included in the predecessor employer's contract. *Wiley*, supra at 545, 551 n. 5, 84 S.Ct. at 909. See McGuire v. Humble Oil & Ref. Co., 355 F.2d 352 (2d Cir.), cert. denied, 384 U.S. 988, 86 S.Ct. 1889, 16 L.Ed.2d 1004 (1966). What the Supreme Court did in *Wiley* was to declare that the national labor policy favoring arbitration as a means of achieving industrial peace is not to be thwarted by unilateral changes in the corporate organization of a business enterprise, which under common law principles would have the effect of nullifying a preexisting contractual duty to arbitrate. In the Court's language, "[i]t would derogate from 'the federal policy of settling labor disputes by arbitration,' [citation omitted] if a change in the corporate structure or ownership of a business enterprise had the automatic consequence of removing a duty to arbitrate previously established * * *." *Wiley*, supra, 376 U.S. at 549,[11] 84 S.Ct. at 914. In the present case, if the parties are unable to agree on the integration of the Hyde employees into the Bath unit, the national labor policy favoring arbitration can be fully effectuated by arbitration under the Bath contract. Neither *Wiley* nor any decided case which has been called to this Court's attention declares or implies that any principle of current federal labor policy requires a contrary result.

■ For the foregoing reasons, the Court holds that the collective bargaining agreement of October 31, 1963 between the defendant and the plaintiff has been since September 1, 1964, and now is, legally binding upon the defendant in relation to those draftsmen who were formerly employed by the Hyde Windlass Company, but who as a consequence of the merger of the Hyde Windlass Company into the defendant on September 1, 1964 became employees of the defendant.[12]

Judgment will be entered for the relief demanded in the complaint.

11. The competing considerations and their resolution in *Wiley* were thus stated by the Court:

> Employees, and the union which represents them, ordinarily do not take part in negotiations leading to a change in corporate ownership. The negotiations will ordinarily not concern the well-being of the employees, whose advantage or disadvantage, potentially great, will inevitably be incidental to the main considerations. The objectives of national labor policy, reflected in established principles of federal law, require that the rightful prerogative of owners independently to rearrange their businesses and even eliminate themselves as employers be balanced by some protection to the employees from a sudden change in the employment relationship. The transition from one corporate organization to another will in most cases be eased and industrial strife avoided if employees' claims continue to be resolved by arbitration rather than by "the relative strength * * * of the contending forces," Warrior & Gulf, supra, 363 U.S., at 580, 80 S.Ct. at 1352, 4 L.Ed.2d 1409.

*Wiley*, supra 376 U.S. at 549, 84 S.Ct. at 914.

12. In so holding, the Court expresses no view as to the extent to which, in any arbitration within the framework of the Bath contract, the arbitrator may properly give weight to any provisions of the former Hyde agreement covering these employees.